Alfred E. Mann Foundation v. Cochlear Corporation Mr. Jakes. Good morning and may it please the court. After originally granting a new trial on damages here, the district court did a complete reversal on remand and reinstated the verdict. The evidence doesn't support that verdict for multiple reasons. Cochlear also categorically denies that they were a willful infringement. They did not copy AB's design. The district court originally found there was no substantial evidence of willfulness the first time we decided this issue, but the court reversed itself again and made further errors on its enhancement analysis. Before I get to the substance of our damages argument, I'd like to address AMF's waiver argument. Both AMF and the district court in this case are wrong in saying that Cochlear can't challenge damages. At most, a waiver in this case might preclude Cochlear from arguing that based on the lack of differentiation in the verdict form, we can't challenge that. Cochlear made many other arguments, in particular the failure of AMF's expert to apportion the royalty rate in the license agreement down to the patents in suit when there were multiple patents and know-how, or the expert's use of the stock price, which was speculative and unforeseeable six years after the hypothetical negotiation, or the expert's use of the entire sales revenue without proving the entire market value. We raised these arguments in a motion in limine before trial, which the district court denied, and Cochlear raised them again in its new trial motion, and again on remand. These arguments don't in any way depend on the verdict form and can't be weighed by any failure to object to the form. There's also another problem here, though. On this record, the evidence doesn't support the jury verdict based on the 616 patent alone. AMF could have accepted the new trial and presented its evidence tailored to the 616 patent, but it argued that the verdict should be reinstated because the entire damages award was supported by the 616 patent alone. Now, remember, AMF tried this case originally, arguing that the patents covered back telemetry generally. There's no way they would be able to do that in a new trial because the 616 patent doesn't cover back telemetry generally. It covers it in a particular way, which is the use of a physician's tester or a display in the office. AMF did not invent back telemetry, and after the Vernetics case was decided, apportionment down to the smallest saleable unit couldn't be done either. There had to be further apportionment. So there would be a problem, and AMF said, we're going to go on this record and argue that there's enough evidence based on the 616 patent alone. Now, the district court here originally granted a new trial based on this court's normal rule, such as in the Verizon case, that if you have multi-patents in a case and a verdict that doesn't specify between them, one of the patents is held invalid. The normal rule is you get a new trial. That was one argument raised in our new trial motion. I've already listed several of the other ones, and that's not our argument here, though. Consistent with the jury verdict, we've assumed that the jury awarded all the damages based on the 616 patent, but that's what the jury did. But the question then is, does the evidence support that? And this was the approach this court took in the Omega case, where the court could have applied the Verizon rule, but instead said there's one claim left, there's no substantial evidence to support it, and remand it for a new trial. That's the approach we're taking here. Now, in arguing that the damages verdict should be reinstated, AMF said we can stand on this record. The problem is the 616 patent is limited to more than just back telemetry. It requires use in the doctor's office, either with a physician's tester or in the method claim. It requires a display, which AMF said is a physician's tester. Didn't the jury have evidence of infringement with respect to both patents? Oh, yes, Your Honor, they did, and they found infringement. And the question asked of them in the jury forum was a general question that said, you know, does the party infringe either patent? Well, as to infringement, they were broken out separately. It was on the damages question. The damages, yes. Right. That if what damages should be awarded for infringement of either. Of either patent. Either 616 or 691. So there was no separate determination of damages for one compared to the other. There was not. And so we now know that damages could not be awarded on the 691 patent because it's invalid. So we look at that and say, is there substantial evidence to support the verdict on the 616 patent alone, as the court did in the Omega case? I mean, that is the difficult aspect, is it not? This verdict form apparently was suggested by Cochlear in the alternative, and now essentially what you're asking us to do is to separate them out, ask the jury again, now go back and do it patent by patent. Well, that's what would happen if we were granted a new trial, is the new trial would be limited to one patent. What I'm asking the court to do is, regardless of what the verdict says, we can assume the jury found the damages were based on the 616 patent entirely. In fact, if that's not the case, then there's nothing to support the verdict. Normally in these situations like the Verizon rule, the problem is you don't know what the jury did. And so they could have relied on the 691 patent for the damages. That's not our argument. It's not based on the verdict form. It's just a straight substantial evidence question. And here there isn't any where there was apportionment tailored to the 616 patent alone, which is narrower than back telemetry generally. Now, as I said at the beginning, there are other arguments that we have that have nothing to do with the verdict form or even this one patent versus the other, such as the expert's failure to value the other patents in the AB license agreement. Now, something more was required than an expert to say, I talked to some people and they told me that all the value is due to these two patents. The expert said, I assume the primary value is attributed to the patents in suit. An expert can't do that. That's not proof of that fact. So where is the evidence? The expert said, there's been no basis presented for identifying any portion that could be attributed to other things. She didn't know what she was supposed to know. In cases like this, you have a multi-patent license agreement. Only two of the patents are at issue. There's also a know-how license. You can't just take that royalty rate. You have to figure out what was due to those two patents. And the expert completely failed to that. Her methodology was unreliable. And if you actually look at what's in the record, nobody testified. No fact witness. No other expert testified. The value is due to only these two patents. In fact, you have AMF's witnesses testifying about all the other great features in their products, that all these features contributed to its success. There were such things as the hermetic seal. They listed them all as they were touting their product. Well, those are covered by the patents in this license agreement. AMF, Advanced Bionics, they mark their products with every one of these patents in the license agreement. So they cover the product. And then to just say, well, we assume that all the value is to these two patents, that's wrong. That's wrong methodology. It's very much like the Apple versus Motorola case where an expert did that exact same thing. She relied on another witness who said, well, in this multi-patent license agreement, I would give 40% to 50% to just one of the patents. This court said that's unreliable. It was unrealistic. Here, the expert gave 100%. In that case, both the expert and the other witness were excluded as unreliable. So we have a fundamental problem with what the expert did on the license agreement. That's not all. The stock price. The agreement between AMF and AB provided that AMF would get a million shares of stock. Now, remember, the hypothetical negotiation is in 1998. This is a fairly contemporaneous agreement, 1999. We're not arguing otherwise. What was the value of that stock at the time of the agreement? It was $2.80 a share. What the expert did was say, well, look, in 2004, six years later, when Boston Scientific came in and bought the company, it was worth a lot more. It was worth over $100 a share. Well, they didn't know that in 1998. No one could have known that in 1998 or 1999. That's just speculation. In fact, Mr. Mann, the founder of AMF, he said that was a crazy deal, and he couldn't have even expected it. And that was used to inflate the royalty rate to almost 9% when the agreement otherwise said 2% to 3%. Wasn't that part of the expert's analysis following the so-called Book of Wisdom? Yes, Your Honor. There is something called the Book of Wisdom. Tell us why that was wrong. The Book of Wisdom allows you to look at some data in the future. I'll grant that. Where it was something that the parties would ordinarily estimate at the time and to confirm that that was correct. The jury heard evidence to that effect, did they not? Not really. Our expert did challenge that and say that it was unforeseeable. The only evidence here is that it was unforeseeable. If the Book of Wisdom stretches this far, then the time of the hypothetical negotiation really doesn't mean much. If you can do that six years later and look at a stock price that no one had any idea would increase this much, then the Book of Wisdom is not really wisdom. It's speculation. And that was a further mistake that the district court made in not granting a new trial. These are problems we raised before trial. This evidence shouldn't have come in. Same with the entire market value rule. The expert was allowed to testify that the entire revenue base was the royalty base without proving that these particular features drove the demand. And we know now from cases like power integrations that the features that are patented have to be the sole driver of demand. And yet we have AMF's witnesses testifying about all the other features, how they contributed to the commercial success of the product, and how important they were. In this case, using the entire royalty base without proving that that demand was created by the patents, it violates the entire market value rule. Now, I'll grant that this case, it was tried in January of 2014, and this court's had a lot of law since then, such as the Vernetics case, among others. And it certainly has developed since then. But we apply the law as it is today. And under the laws that exist, there is no substantial evidence to support the jury's verdict on damages because of these failures. The expert's evidence was unreliable, and it shouldn't have come in. Even if it did, it's not enough to support the verdict. I mentioned willful infringement at the beginning. We maintain that Cotlayer was not a willful infringer. These are not the kind of egregious facts that rise to willful infringement. If I could just touch on the enhancement part of it, though. The judge here doubled the damages. And under this court's law, if the court makes mistakes in its assessment of those factors, this court vacates and sends it back. I think that's the Polera case that we cited, where the court made a mistake in evaluating the closeness of the case. That was enough to vacate and remand the enhancement decision. We believe that should happen here, too, because the court made at least four mistakes in those factors. The most problematic, I'd say, is the finding of litigation misconduct based on Cotlayer's filing an ex parte re-exam. The court must have not understood what ex parte re-exams are. There's a statutory right that says the party can file a re-exam anytime during the enforceability period. And somehow this was litigation misconduct. The re-exam was filed seven years into the litigation? It was filed post-verdict, yes. And the patent had expired at that point? It was right in that time period, but it was certainly post-verdict. And that has been done multiple times. And this court has vacated judgments where the patent office has post-verdict, found that the patent claims are invalid on an ex parte re-exam. There's nothing improper about that. It has happened. The judge didn't seem to appreciate that that could happen. He somehow thought that Cotlayer was trying to vexatiously increase the litigation. The request for re-examination was initially granted as a substantial question, was ultimately denied. But it's not the kind of litigation misconduct that the court could rely on to double the damages here. We're talking $140 million. The court made several other mistakes that we have in our brief. And was there any specific questions? No, let's hear from the other side. We'll save you a little time. Mr. Fidgeson? May it please the court. My friend describes this in large part as a substantial evidence challenge. And that obviously brings with it some very important and deferential standards of review. But there's one point I'd like to note at the outset, which I think you need to also keep in mind when you think about this. There's no Daubert challenge here. There was a Daubert challenge in the district court, but it hasn't been renewed in this court. And this court has recognized there's an important distinction then that comes with that, which means that if the objection is to the methodology of the expert, that's what you take up by way of Daubert. That's the Versada software case. And if your complaint is just about the facts and the persuasiveness and the rest of it, that's what the jury's for. And consistently, that's what Verizon is complaining about. I'm sorry, that's what my friend and Cochlear are complaining about in this case. And so we've got to keep that marker line very much in mind. So I'd like to turn first then to his point about the waiver. As Judge Newman noted in her separate opinion in the last go-round here, there's no question that Cochlear proposed these forms, that that's the way the submission was given. The foundation proposed a form that would have broken down the damages by claim. There's certainly a waiver with respect to that. But more importantly, the waiver goes broader. The key point here with respect to differentiating the 616 and the 691 patent is both experts agreed on the royalty base, $1.8-plus billion. Their own expert, Mr. Parr, testified, I couldn't come up with another way to derive the base. Verizon, I'm sorry, Cochlear itself has said that using the royalty rate as the means to adjust the base, page 20 of their reply brief, is perfectly permissible exercise. So when I hear my friend, and the other key point with respect to the two patents is both experts kept the royalty rate that they applied to the base consistent even after the 691 patent expired five years before the other. So there's no basis to differentiate the damages with respect to the two patents in this case. And my friend talks about what he calls the Verizon rule of this court. In the Verizon case, in the DDR case that they cite, what this court did is it remanded to let the district court make a determination of whether or not the verdict could be upheld because there was no prejudice based upon the partial reversal. But more importantly, this is an issue which is governed by regional circuit law. The Ninth Circuit has their traverse factors, which were derived by Justice Kennedy when he sat on that court. And they go through and talk about when it becomes necessary to upset a general verdict based upon a partial reversal. And if you apply those factors here, which Cochlear has never even tried to do, it becomes very clear that there's no basis whatsoever for suggesting that the verdict has to be reversed with respect to the 691 patent's presence. Now, my friend talks about the entire market value rule, the Vernetics case. Let's stop for a minute. The entire market value rule, the single smallest salable patented product rule, those have to do with the base. Here, both experts agreed on the base. Second, the Vernetics case of this court was decided in 2014 before the remand proceedings occurred. It was never presented to the district court. The entire market value argument that you heard this morning was never presented to the district court. It doesn't have any relevance in a case where you use the rate. And even after the Vernetics case was decided, in the Commonwealth Scientific case, the chief judge who wrote the Vernetics case wrote yet again something this court has said many times, which is in many cases it is perfectly proper to allocate the responsibility between the patented and the non-patented features of a product by way of the royalty rate. And that's exactly what their expert did, and that's what our expert did. Now, I'd like to turn for a minute to the question about whether the patent, the 616 patent, is entirely applicable to a so-called physician's tester. That's just plainly incorrect if you look at the two claims. It's certainly true that Claim 1 involves a physician tester, but Claim 10 is a broad method claim with respect to back telemetry. But we don't really know where the jury placed their emphasis. But the problem, it seems to me, is the jury instruction. Could you shed some light on the origin of that instruction and the alternative? You mean the alternative of the verdict form, Your Honor, that it's either or? Yeah. So this is a subject Your Honor addressed or thought about the last time we were here. That verdict form was prepared by Cochlear, submitted by Cochlear. The district court said, I want you to try to break down liability with respect to the separate damages and link them up to the particular patent claims. The foundation presented a verdict form that would have done that. The district judge went with the form that Cochlear used, and as Your Honor suggested last time, that constitutes a waiver of their ability to object. And particularly, again, in a case like this where the damages, both experts did not vary their damage calculation one whit based upon the point at which the 691 patent expired. The same damages were calculated, and they're awardable under both patents because both patents, Cochlear's use of the patent, and that, after all, is what the hypothetical negotiation is supposed to be focused on, valuing the use of the infringing of the patent and the infringement. What was the use? It was impedance-based back telemetry testing, and that was true with respect to the 691 claims. That was true, which were narrower claims, but nevertheless certainly true with respect to the 616 claims. That's what the case was about, and it's true. All of it had to do with the various testing that went on in the office. The 691 claims do not, by their terms, talk about the necessity of displaying these measurements that were being made. But without the measurements, they weren't of any particular use. I mean, if you have a thermometer in your head and no one knows what it's determining, it's not of any value, and no value would be specifically assigned to that. So there's really no differentiation with respect to the back telemetry use, nor is there any basis to differentiate between the two patents. I'd like to turn my attention to the AB license. My friend says that the AB license somehow was inappropriate because the expert in this case, again, whose methodology hasn't been challenged, that the expert in this case inappropriately relied on a license, which was to 12 patents, and assigned the value to two, and somehow she had no basis for doing that. It's not at all correct to say that she had no basis for doing that. Her testimony was that she talked to five knowledgeable people to help ascertain what the value was of this patent, these various patent rights which were being licensed. This included the co-inventor as to nine of the patents, included a gentleman who was with AB at the time of the negotiation for the AB license, which was one year after the infringement started in this case. Each of them caused her to conclude that it was reasonable to assign the value to these patents. There is no evidence. These other patents, which are described in that license, are not in the record. There's no evidence that they were ever practiced by the infringing products, and so there's no indication that they had any particular value in this particular setting. And moreover, my friend talks about a memorandum that Alfred Mann, the founder of the foundation, noted, in which he made some comments about getting value for all the various parts of the technology. Mr. Mann was an astute negotiator. He was impatient by the fact that there hadn't yet been an agreement that he thought should have been reached by that point. And most importantly, he's also talking about a totally different technology in that memo called the Bion battery, which has nothing to do with what brings us here. And I reiterate, none of those patents are in the... There was never... They're not even in the record of the case. There's no evidence that they played any role with respect to the use that Cochlear made of the foundation's technology, which, of course, is what we're trying to view in this kind of a context. I'd like to turn to the stock and to the book of wisdom. With respect to the stock in this case, let's keep something in mind. AB was not some mere startup company. By the time we're doing the negotiation, it had entered into the market. It had seized 30% of it from Cochlear, which had been the undisputed monopolist up until that point. And it had gotten FDA approval to become the second entry in the Cochlear implant market. My friend urges use of a $2.8 million stock value, which is book value of a non-public company. It's an accounting entry, which has no meaningful market value. It's certainly proper for the jury, again, which is supposed to do the evaluation in this kind of situation, to consider the evidence of what had been developed by the organization in this context. This court has specifically endorsed the notion that you look at the future, not just through the book of wisdom. Integral Life Sciences, 331F3871. This court held in the context of a lump sum, reversing a lump sum patent royalty, that on remand, the court should take into consideration the fact that the company had thereafter been sold for a price, which would inform the relative value of that lump sum royalty and whether it made sense. But the actual value six years later might have been a wish or a hope, but if you go back to the time at which these negotiations are supposed to have taken place, that was quite an optimistic figure, was it not? No, it wasn't unreasonable. At first, the court has made clear that there's an element of guesswork made necessary as to all of this by virtue of the fact that it's an infringement and we're being forced to do an evaluation, which was made necessary by the infringement. Judge Markey, in the Fromsen case, which the court also relied on the Lucent case, said of this exercise that what it requires is that it permits and often requires a court to look to events thereafter and that could not have been known or even predicted by the hypothetical negotiators, but nevertheless, there was a history... Isn't that true? I beg your pardon? They might have hoped, but could they have predicted? Well, Judge Markey says that we don't close our eyes under the book of wisdom to what we know proved to be the facts of the case, even though it might not have been fully predicted of the outcome. But here, there's plenty of evidence of foreseeability based upon the pattern of the Foundation consistently taking equity and the fact that Mr. Hankin, the CEO, pointed out that as the organization did that, they consistently received greater revenue from their equity stake than they did from the revenue stream that they got. And here, the expert used those numbers to help derive her calculation. Let's change the subject to willfulness. Yes, certainly, Your Honor. Explain to us what's wrong with exercising your right to challenge a patent in the Patent Office. Well, that is not the basis for that one element of the enhancement factor to which... It's not? It looked like it. No, no, no, Your Honor. You're sure that that was harassing? No, no, no. It was litigation... Caused you to spend more money? Correct. That's true. Litigation misconduct. But it's not predicated merely on pursuing the reexamination. The key part of that with respect to the reexamination was that Cochlear took the position that with respect to an expired patent that the Foundation was not allowed to rely upon the attorneys who had represented it in the case by that point for, what, 10 years during the long history of this... Is that what you're relying on? That there was an eyes-only kind of agreement? That's correct, Your Honor. That suffices to... Did that prevent the response to the challenge in the office? What it did, Your Honor, is it meant that the Foundation had to go through the entire process of litigating the ability of having its lawyers participate, a very expensive, lengthy litigation process, whereupon they dropped the issue, and they allowed the attorneys to participate anyway. But that's not the only thing that we're talking about. The judge sanctioned Cochlear for also the conduct that occurred in his courtroom. Among other things, if you look particularly at page 37 of the appendix, he talks about a kitchen sink approach to the litigation, and in particular... Yes, the judge thought it was very strange that you have all these paths of attacking the patent. I agree. I think it's very strange, but it's in the law. Again, but the one element we're talking about is... I don't think you have to look at it as the initiation of the reexamination. You have to look at it more broadly as the conduct of disputing the ability of the foundation to have its attorneys present and then dropping the idea, and also the conduct in the case, including refusing to agree to all sorts of very basic sort of stipulated facts that are routinely undertaken in the course of litigation. And then let's... How does that make the infringement willful? Your Honor, this goes, I think, to the enhancement element. That's what my friend was talking about. This is one of the read factors that the court was talking about. If we're going to... And, of course, there were 15 of them, and there's a whole series of them that they don't even contest establish the basis for the enhancement. If we go back to the willfulness, the judge relied, as the jury was permitted to, on the clear evidence of copying, on the fact that they never, ever had a defense that they asserted to Claim 10, on the fact that there was a stipulated fact, they finally agreed to let the jury hear that they had no opinion of counsel in the case. So those are among the factors that support the willfulness determination, which, again, was a fact question for the jury. And I notice my time is up, and I don't want to overstay my welcome unless there's questions or you'd like me to address any of the other issues. Any more questions? Anything else? Thank you. Thank you. Mr. Jakes, you have your rebuttal time. Thank you. We did challenge the expert's methodology in a motion in limine, and we've made those same arguments on this appeal. Whether it's styled as a Daubert motion or not, we have challenged the reliability of the expert's methodology throughout. Now, my colleague says that both experts agreed on the royalty rate, and that apportionment can be done by apportioning the rate. Their expert did no apportionment of the rate. She only increased it. Her apportionment came based on an arbitrary adjustment that she did after looking at the income approach. She testified there had to be an apportionment of this profit premium because there were other non-infringing features. And then she said, but she couldn't find it in the numbers. She didn't do what she was supposed to. So then she arbitrarily reduced the rate by about a little over 1%, based on her common sense and experience. That's not adjusting the rate for apportionment where you use the entire market value. I don't want us to get hung up on this Verizon case in this rule because that's really not her argument. That's what the judge did the first time, and that's based on the verdict form. Our argument says, okay, we accept that the jury could have awarded all the damages based on the 616 patent, and then it becomes a substantial evidence question, as in the Omega case, not whether the jury made a mistake in awarding damages for the 691 patent, which has been invalidated. On the 616 patent scope, counsel says that Claim 10 is a method claim and it's not limited to a physician's tester. It requires a visual display. Patients don't wear a visual display. AMF took the position on validity that it required a physician's tester. They're changing their tune on that. But Claim 10 is considerably broader than Claim 1, is it not? Not by requiring a visual display. Whether you call it a physician's tester or a visual display. It could be any display of any sort. It could be. And the physician's tester, our laptop computer was basically found to infringe as a physician's tester. So there really isn't a differentiation based on that. There is a difference with the 691 patent, though. There are other uses for back telemetry other than in the doctor's office. It's used in the automated features of the implant. When the patient turns it on, there's no visual display. But it does that same back telemetry testing. It adjusts the power that is delivered to the electrodes. While the patient is wearing it, not in the office. So that's a different aspect of back telemetry. And to suggest both patents have the same scope is not right. On the license agreement, the people that the expert talked to, none of them testified. They didn't come in and say, all the value is in these two patents. And it was established also at trial that none of them were there at the companies at the time of the hypothetical negotiation. The point that AB is not a startup, well, I'm not really sure what difference that makes. But anticipating this type of increase in the value of the company six years earlier, even the founder of AMF said that was not foreseeable. And finally, on the actual value of the stock at the time, they said they were improperly looking at the book value. Okay, where was the market value at the time? They didn't establish a market value. They could have said, here's how we would do this. Here's what's happened in other situations. Instead, the expert just went to the very highest point of the stock price and said, I'm going to use that and called it the book of wisdom. Any questions? Okay. Thank you. Thank you. Thank you both. Okay, so second under submission.